IN THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| MICHAEL B. THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | COMPLAINT |
| v. | ) | |
| | ) | Civil Action No. _____ |
| | ) | |
| STRONGWELL CORPORATION | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INTRODUCTION

1.       This is a race discrimination action for wrongful termination; work place harassment and abuse, discriminatory wages, benefits and terms and conditions of employment, and retaliation because of plaintiff's race, ancestry, ethnicity and national origin. This action seeks compensatory damages, punitive damages, back pay, reinstatement or front pay (in lieu of reinstatement), attorney's fees and costs, for deprivation of rights secured by 42 U.S.C. § 1981, (§1981) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000-e, et seq. (Title VII).

## JURISDICTION AND VENUE

2.       Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1343, 42 U.S.C. §2000-e, et seq. and 42 U.S.C. §1981.

3. Regarding the Title VII claim, Mr. Thomas has timely filed a claim with the United States Equal Employment Opportunity Commission (EEOC), has received a notice of right to sue and has filed this complaint within ninety (90) days of receipt thereof.

## PARTIES

4. Plaintiff Michael Thomas is an African American male, age 54 and a resident of Bristol, Virginia.

5. Defendant Strongwell Corporation is a Virginia corporation (Strongwell), having its principle business location in Bristol, Virginia. Strongwell is an international commercial designer and fabricator of fiber-polymer, glass, carbon and fiberglass materials and objects used in major industries including building, defense, water/waste water, automotive, bridges and off shore oil drilling platforms, among others. The Corporation has four manufacturing locations: Bristol, Virginia, Washington County, Virginia (The Highlands), Chatfield, Minnesota and Apodaca, Nuevo Leon in Mexico. Strongwell's corporate offices, including finance, marketing and human resources are located in the Bristol, Virginia facility along with a state-of-the-art testing laboratory. Strongwell conducts a substantial portion of its affairs in the Western District of Virginia where its Bristol and Highlands facilities are located.

## FACTS

6. Plaintiff Michael Thomas was employed by Strongwell at its Bristol, Virginia location from June 22, 1992 to May 4, 2018. Over more than 25 years employment with Strongwell, Mr. Thomas was a good and loyal employee

2

with a spotless record: no work rule infractions, warnings, reprimands or other blemish on his record of any kind. On May 4, 2018, Mr. Thomas was the 4th most senior employee in Strongwell's Fabrication Department.

7.      On May 4, 2018, Strongwell Corporation had and now has more than 501 employees.

8.      At times material hereto, Lydia Sinemus ("Sinemus") was employed as the Director of Human Resources for Strongwell. At times material hereto, Sinemus acted within the actual or apparent scope of her employment.

9.      At times material hereto, Billy Phillips ("Phillips") was employed as a supervisor over Mr. Thomas' department. At times material hereto, Phillips acted within the actual or apparent scope of his employment.

10.     At times material hereto, Frances Hart ("Hart") was employed as a team leader in Mr. Thomas' department. At times material hereto, Hart acted within the actual or apparent scope of her employment.

11.     During the course of plaintiff's employment, the Fabrication Department employed approximately fifty (50) people. During Thomas' first few years, there were two other African Americans in the department full time. They were terminated or quit within a couple of years. During more than 20 years, Mr. Thomas was the only African-American working in the Department full time.

12.     On May 4, 2018, Mr. Thomas was a Fabricator A, having worked his way up from Fabricator C, in the Fabrication Department. In that capacity, he used and read product blueprints and assembled, composed and completed final products from parts and materials created according to the prints, as did all the

3

other employees in the department. Mr. Thomas achieved Fabricator A level after approximately 20 years, when white employees were promoted to this level within far fewer years, some after 2 and 3 years. On May 3, 2018, Mr. Thomas earned $16.3267 per hour for his work when others doing the same fabrication work were earning more than $20.00 per hour for the work. Approximately a decade earlier Mr. Thomas earned $12.00 per hour compared to $20.00 per hour earned by coworker- R. Jones, who showed his paycheck. Upon information and belief, Mr. Thomas was regularly the lowest paid Fabricator at his level in the Department while all were performing the same fabrication work.

13.     Work assignments from supervisors including  Mr. Phillips, were generally equal, but with two major exceptions. Mr. Thomas was routinely assigned the dirtiest, grungy, messy, most unpleasant work, such as combining resins with fiber, polymers, sand and other ingredients by hand, then sanding and polishing to create composition parts, painting and manual work requiring heavy lifting. Supervisors Reynolds and Phillips assigned Mr. Thomas the dirtier and more manual jobs that other persons (all white) did not want to do. Mr. Thomas was also assigned work that provided fewer opportunities to progress and acquire new and different skills; those opportunities were given to white employees with less experience and less seniority than Mr. Thomas. Many white employees, less experienced and less senior than Mr. Thomas were promoted to another level and called "specialist". Mr. Thomas requested this work from his supervisors but was not given the work assignments to perform the skills on

4

which promotions were alleged to be based. He also questioned the regular assignments of the most unpleasant work but was told, "That's just how it is."

14.     Mr. Thomas was routinely ignored and avoided by Supervisors including Phillips, who made small talk, conversed with and joked with the white employees but not Mr. Thomas. When asked why he was not treated as the others, the reply was usually, "I have nothing to say to you" or "we have nothing in common." The only time he was spoken t, was when receiving work assignments. Mr. Thomas was regularly singled out by Phillips and Team leader Hart as the recipient for comments applicable to all, such as, "not fast enough", when all were performing the same. When he asked, "why am I being singled out", there was no explanation.

15.     Over the entire period of his employment at Strongwell, Mr. Thomas has been subjected to continuous and pervasive racial harassment. This harassment, along with threatening language and behavior, were regular beginning in 2008 and continuing to his termination on May 4, 2018.  After July 2016, the harassment became particularly severe including almost daily ridicule and mockery from coworkers who would say to him, "black people wanted to be slaves", "they were fed and taken care of", "you're the racist", "you're brainwashed;" "black people had it good as slaves." And "we don't like your black President, because his name is Obama and he's black"; "the (Obama) girls are adopted because Michele is a man who had a sex change;" "she looks like an ugly monkey, ugly nappy hair."  Continuing some would say, "go back to Africa",

5

"You don't believe in God." From coworker I. Testerman: "I'm sick of your black ass."

16.    Mr. Thomas' department Team Leader, Francis Hart regularly did mocking, taunting, insults and putdowns regarding "your black president", other "Obama bashing", in an effort to goad Mr. Thomas to respond inappropriately: "I hate Obama, he is a liar." "He is the worst president in history." Ms. Hart would also ridicule "black men" in Mr. Thomas' presence and in speaking to him directly, for not "claiming the children they fathered" and "not taking care of their families."

17.    Mr. Thomas was called the N____ word on many occasions::by coworkers D. Hauser, T. Sleuter, and T. Hilliard, among others. Some would stop and mockingly say, "oops, sorry 'bout that..."

18.    Guns were discussed almost daily: types owned, shooting ranges, cans, targets, distances, shooting skill, things killed, hunting, buying guns, going to gun shows, etc. Mr. Thomas was ridiculed and mocked for not keeping his guns loaded and with him: "what good are they if they're not loaded and ready to use?" "If you don't like our guns in stores and restaurants, go back to Africa.." Profanity was prevalent. This taunting and attempts to argue with Mr. Thomas was constant. Mr. Thomas believed that he was constantly goaded by coworkers because they were trying to make him upset, mad in an effort to get him to quit or get him fired. He was made to feel he was never as equal as the new white employee coming in the door. Supervisors and team leaders heard this behavior but generally ignored it. Team leader Hart participated.

6

19.     Mr. Thomas suffered discrimination in his work assignments, training and working conditions. Mr. Thomas did the work because he had no choice. Mr. Thomas signed for job openings posted in 2017 and 2018, for internal moves-lab openings for example- but was never interviewed for any. This was contrary to company custom and policy because all internal applicants other than Mr. Thomas, received interviews. Mr. Thomas' supervisors placed him in positions most removed from exposure to new and different skills to limit his ability to learn new skills for promotion. Mr. Thomas had to learn these skills on his own time.

20.     Workers in the fabrication department sometimes worked in pairs depending on the product. White employees were permitted to choose, but Mr. Thomas was always assigned a coworker by his supervisor depriving Mr. Thomas the opportunity to work with those more skilled and those with whom he got along. White workers were also permitted to choose their work.

21.     The verbal abuse and harassment, feeling kept down and ignored were all offensive, hurtful, demoralizing, and embarrassing to Mr. Thomas. He had no choice but to continue to work in order to care for his family and keep their health insurance. Mr. Thomas had studied graphic design at the Maryland Institute of Art for a year after high school. He liked the fabrication work.

22.     At least since its employment handbook revised April 16, 2014, Strongwell has had a policy prohibiting racial harassment and  "racial slurs" in the workplace. It states: "We expect all employees to treat one another with courtesy, respect, and consideration". This policy recognized that

"The use of profane, foul, obscene, insulting, abusive or crude language, inappropriate jokes, *racial slurs*, sexual comments even if spoken in non-standard English/foreign languages, or the making of verbal threats is considered disrespectful, demeaning and abusive behavior. *This abuse usually causes great anxiety and stress for the recipient and may give the recipient reason to be concerned for his/her safety and well-being.* Vulgar and offensive language can cause real harm, crosses the boundary of appropriate conduct and even disrupt the entire workforce." (Emphasis added.)

This policy was routinely ignored in Mr. Thomas' Department. No one was ever reprimanded, warned or even cautioned for the abusive treatment of Mr. Thomas.

23. Over the six weeks preceding May 1, 2018, Mr. Thomas had worked more than 73 hours overtime along with other employees in the department in an effort to meet production obligations set by supervisor Billy Phillips. On the morning of Tuesday, May 1, 201,   Mr. Phillips called a meeting of the employees on the floor and loudly and angrily chastised them all telling them they were not working fast enough and producing enough and that he intended to time their work, including breaks and trips to the restroom, to get what the company needed from them and they had to step up.

24. Following this May 1, 2018 meeting, approximately a dozen or so employees in Mr. Thomas' department went to the break room, he with them. There was a general outpouring of frustration and disappointment that they had been working hard and feeling unappreciated. There were multiple conversations occurring all at once with participants talking to and over each other, all at once, expressing that same sentiment. During this time Mr. Thomas commented to no

8

one in particular, "I can see why some people go postal". His comment was part of the general ongoing conversations, no one seemed to notice, no one responded, as none was expected, all conversations continued and following the break, all went back to work as required. Mr. Thomas completed his shift. He returned on the next day, May 2, 2018 and completed his usual shift. He reported to work on May 3, 2018, as usual and worked through until approximately 2:30, 30 minutes prior to his shift end when supervisor Billy Phillips came and asked him to go with him to the human resources office. Mr. Thomas had no idea the purpose but assumed it was some routine paper he had failed to sign. On the way, Mr. Phillips said he heard Mr. Thomas had a new riding lawn mower and asked how he liked it. This seemed a bit out of the ordinary because Mr. Phipps never conversed with Mr. Thomas, he ignored and avoided Mr. Thomas unless he was giving a specific work instruction.

25.     When Mr. Thomas and Mr. Phillips arrived in the human resources office the HR director, Lydia Cinemus, was waiting for them and had in front of her a completed Corrective Action Form with Mr. Thomas' name on it. She presented it to him.

26.     Under "reason for action" the form stated: "On May 1, 2018 you made comments to fellow employees suggesting bodily harm to other employees. This conduct will not be tolerated by Strongwell". It further said "This document serves as formal notification and documentation that any further issues with Strongwell's rules or guidelines will result in further disciplinary action up to and including discharge". It was signed by Billy Phillips and dated May 3, 2018.

9

An X was placed beside "Final Warning." See Exhibit A. There was no indication from Phillips, Sinemus or on the form that Mr. Thomas was discharged. Ms. Sinemus proceeded to tell Mr. Thomas that some employees had reported to Mr. Phillips that Mr. Thomas had threatened them by saying that he "was going to bring a gun to work and start shooting and everyone should run when they saw him coming because he was going postal". Mr. Thomas denied making such statements. He denied that he threatened anyone. He denied that he would ever do such a thing and denied making the statements attributed to him. He also denied suggesting bodily harm to anyone. Ms. Sinemus also informed Mr. Thomas that he was suspended for I day-Friday without pay. He requested clarification that he was suspended for Friday, May 4 without pay and was to return to work on Monday, May 7. He was assured that was correct. He was not given a written notice of the one day *suspension* and *loss of pay* and it was not mentioned on the Corrective Action Form he was given. . Mr. Thomas signed the receipt for the form feeling he would be discharged if he did not.

27.    At the meeting with Mr. Phillips and Ms. Sinemus, Mr. Thomas asked who thought he had threatened them. He was not told the identity of anyone reporting to have been threatened by him. Mr. Thomas was given no opportunity to hear the claims against him and respond nor appeal the discipline he was being given. Being most concerned about his job he understood he was to return to work on Monday.

28.    During the course of the discussion with Ms. Sinemus, Mr. Thomas was told employees were free to bring such complaints to Mr. Phillips or to her in

Case 1:19-cv-00026-MFU-PMS   Document 1   Filed 07/10/19   Page 10 of 15   Pageid#: 10

the HR Department at any time. During this discussion Mr. Thomas told Ms. Sinemus that he was mistreated and felt threatened on a virtually daily basis by racial slurs and other intimidation. She responded that he should bring those concerns to HR. He said that he would return to her office to do that.

29. On Friday, May 4 in the afternoon Mr. Thomas received a telephone call from an unknown number, not a Strongwell number, he answered and it was Ms. Sinemus on the phone. She told Mr. Thomas that he was discharged and not to return to work the following Monday. No reason was given for his termination.

30. All the conduct of defendant and its agents described herein was intentionally discriminatory because plaintiff is African American and black. Mr. Thomas was the object of harassment, discrimination and abuse and disparate treatment because he is black; not because nondiscriminatory motives and intentions resulted in the outcomes adverse to Mr. Thomas. Strongwell discriminated against plaintiff intentionally or with reckless disregard of the law, because of race, ethnicity and national origin. Strongwell and its agents discriminated against plaintiff knowingly and intentionally and acted willfully or with reckless disregard of the law in depriving plaintiff of employment opportunities and permitting ongoing workplace harassment because of his race, ancestry, ethnicity and national origin in violation of law.

31. As a result of Strongwell's intentional and reckless violations of 42 U.S.C. §1981 and Title VII, plaintiff has suffered loss of income, loss of earning capacity, loss of benefits, loss of career opportunity, loss of career investment,

11

and loss of advancement and has suffered humiliation, loss of standing in the community, emotional pain and suffering, embarrassment, inconvenience, loss of enjoyment of life, irritation and mental anguish. Plaintiff also suffered retaliation because of his race by reporting to HR Director Lydia Sinemus that he was subjected to racial abuse and threatening behavior on a daily basis and assuring her he would return to report that. On the following day, May 4, 2018, he was terminated on the phone by Ms. Sinemus, without being given a reason.

## §1981  DISCRIMINATION

32.    Plaintiff incorporates by reference herein all the other paragraphs in this complaint.

33.    The actions of STRONGWELL and its agents described herein constitute discrimination based upon race, ancestry, ethnicity, and national origin in violation of 42 U.S.C. §1981.

34.    As a direct result, plaintiff has suffered and will continue to suffer he losses and injuries described throughout the complaint and in particular those identified in paragraph 28.

35.    Defendant acted willfully or with reckless disregard of the law in depriving plaintiff of employment opportunities and permitting ongoing workplace harassment because of his race, ancestry, ethnicity and national origin. Because of statutorily impermissible and willful, if not malicious, acts of Strongwell and its agents Mr. Thomas, has suffered loss of income, loss of earning capacity,  loss of benefits, loss of career opportunity, loss of career investment, and loss of advancement pursuant to Title VII of the Civil Rights Act or 1964 and 1991, as

12

amended and codified at 42 U.S.C. §2000e et seq. ("Title VII). He has also suffered humiliation, loss of standing in the community, emotional pain and suffering, inconvenience, loss of enjoyment of life, irritation and mental anguish. He seeks reinstatement, recovery, compensatory, and equitable (i.e., back pay and front pay) damages, as well as attorney's fees, and costs and pre and post judgment interest in the maximum amounts allowed by law pursuant to Title VII of the Civil Rights Act or 1964 and 1991, as amended and codified at 42 U.S.C. §2000e et seq. ("Title VII").

WHEREFORE, plaintiff respectfully asks this Court for the following relief:

1. Issue declaratory judgment that Defendant's acts violate 42 U.S.C. §1981;

2. Issue a permanent injunction restraining Defendant from violating the provisions of 42 U.S.C. §1981;

3. Order Defendant to pay to plaintiff compensatory damages in the amount of THREE MILLION DOLLARS ($3,000,000.00); and punitive damages in the amount of FIVE MILLION DOLLARS ($5,000,000.00) with interest in the maximum amounts allowed by law.

4. Grant plaintiff's costs, expenses and attorney's fees.

**Plaintiff requests trial by jury**.

### Title VII Discrimination

36. Plaintiff incorporates by reference herein all the other paragraphs in this complaint.

Case 1:19-cv-00026-MFU-PMS   Document 1   Filed 07/10/19   Page 13 of 15   Pageid#: 13

37.    The actions of STRONGWELL and its agents described herein constitute discrimination because of race, ancestry, ethnicity, and national origin in violation of Title VII of the Civil Rights Act or 1964 and 1991, as amended and codified at 42 U.S.C. §2000e et seq. ("Title VII").

38.    As a direct result, plaintiff has suffered and will continue to suffer the losses and injuries described throughout the complaint and in particular those identified in paragraph 28.

39.    Defendant acted in violation of the law in depriving plaintiff of employment opportunities and permitting ongoing workplace harassment because of his race, ancestry, ethnicity and national origin. Because of statutorily impermissible acts of Strongwell and its agents, Mr. Thomas, has suffered loss of income, loss of benefits, loss of career opportunity, loss of career investment, and loss of advancement pursuant to Title VII of the Civil Rights Act or 1964 and 1991, as amended and codified at 42 U.S.C. §2000e et seq. ("Title VII). He has suffered humiliation, loss of standing in the community, emotional pain and suffering, inconvenience, loss of enjoyment of life, irritation and mental anguish. He seeks reinstatement, compensatory and equitable (i.e., back pay and front pay) damages, as well as attorney's fees, and costs and pre and post judgment interest in the maximum amounts allowed by law pursuant to Title VII of the Civil Rights Act or 1964 and 1991, as amended and codified at 42 U.S.C. §2000e et seq. ("Title VII").

WHEREFORE, plaintiff respectfully asks this Court for the following relief:

1.    Issue declaratory judgment that Defendant's acts violate Title VII;

Case 1:19-cv-00026-MFU-PMS   Document 1   Filed 07/10/19   Page 14 of 15   Pageid#: 14

2.     Issue a permanent injunction restraining Defendant from violating the provisions of Title VII;

3.     Award plaintiff damages for loss of income and employment benefits, including back pay, reinstatement, front pay (in lieu of reinstatement) and compensatory damages for emotional and physical pain, suffering, inconvenience, mental anguish and loss of enjoyment of life, as well as an award of punitive damages, in the maximum amount allowed by law; and

4.     Grant plaintiff's costs, expenses and attorney's fees.

**Plaintiff requests trial by jury**.

Respectfully submitted,
MICHAEL B. THOMAS
By Counsel

__/s/ Mary Lynn Tate_____
Mary Lynn Tate (VSB # 16805)
16006 Porterfield Highway
Abingdon, Virginia 24211
Phone 276-628-5185
Fax    276-628-5045
Email   mltate@tatelaw.com
Counsel for Plaintiff

Date: July 10, 2019